UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                              )
                                    )
        JOEL S. KELLY               )        Case No. 08-14699-SSM
                                    )        Chapter 13
                    Debtor          )

**MEMORANDUM OPINION**

Before the court is the objection of creditor Stephen Todd Leskoski to confirmation of

the chapter 13 repayment plan filed by the debtor on August 6, 2008.  An evidentiary hearing

was held on February 19, 2009, at which the debtor was present in person and was represented

by counsel, as was Mr. Leskoski.  The issues are whether the plan properly provides for payment

of the debtor's projected disposable income to the unsecured creditors, as required by § 1325(b),

Bankruptcy Code, and whether the plan has been proposed in good faith, as required by

§ 1325(a)(3).  For the reasons stated, the court will overrule the disposable income objection but

will deny confirmation on the alternate ground that the plan was not proposed in good faith.

<u>Background</u>

Joel S. Kelly ("the debtor") is a sales representative for a major information technology

company.  He filed a voluntary petition in this court on August 6, 2008, for adjustment of his

debts under chapter 13 of the Bankruptcy Code.  The schedules filed with his petition reported

$18,213 in priority tax debt and $310,376 in general unsecured debt, of which $115,486, or 37%,

was owed to Mr. Leskoski.[1]  His schedules of monthly income and expenses (Schedules I and J)

reflect gross income of $7,583, take home pay of $5,179, and expenses of $3,324, leaving a

surplus of $1,855 with which to fund a plan.  His Statement of Current Monthly Income and

Calculation of Commitment Period and Disposable Income (Official Form 22C or "means test

form") reports current monthly income (CMI) of $7,817 per month, annualized CMI of $93,807,

a household size of one, and allowable means test deductions of $6,523, for a disposable income

of $1,295.

The plan, which was filed the same day as the petition, requires the debtor to pay the

chapter 13 trustee $1,805 per month for 60 months.  From this the trustee would pay his own

statutory commission of 10%, attorneys fees to debtor's counsel of $1,535, and the priority tax

claims.  The remaining funds would be paid pro rata to the unsecured creditors, with the

estimated distribution being 25 cents on the dollar.  Objections to confirmation were filed by the

chapter 13 trustee, the Internal Revenue Service, and Mr. Leskoski.  The trustee and the IRS

have subsequently withdrawn their objections, leaving only Mr. Leskoski's.

At the evidentiary hearing, the debtor testified that he had been employed since March

2008 by a major information technology company as a services sales representative for sales to

the federal government.  His compensation package has two components: a base salary of

$84,000 per year and "target" commissions of $56,000 per year, for a total of $140,000.  The

commission income is based on sales, and the $56,000 figure assumes the debtor will achieve the

sales goal set by his employer.  The commissions can, however, be either higher or lower,

---

[1]  The actual claims, as asserted in the proofs of claim filed in the case, are somewhat higher:
$19,089 in priority tax debt and $317,263 in general unsecured debt, with Mr. Leskoski's claim
being filed in the amount of $137,952.

depending on the actual sales.  During the first four months of his employment, the debtor

received a draw against commissions equal to the target amount divided by 12 (that is, $4,667

per month).  Since then, commissions have been paid monthly based on actual sales through the

preceding month, adjusted for draws previously paid.  The commissions paid to the debtor for

the eight month period from April 2008 through November 2009 totaled $33,613 and ranged

from a low of $2,740 to a high of $6,274.  The debtor testified that since November, he has

received approximately $2,200 per month in commissions, but no pay statements were provided

to show the precise amount or the resulting effect on his take-home pay.  The pay statements

available at the hearing reflected that for the six-month period from June through November

2008, the debtor's average gross monthly earnings were $11,429 and his average monthly take-

home pay was $7,405.  The commissions paid to him during that period totaled $26,576.

On February 18, 2009 (the day prior to the evidentiary hearing) company employees

were advised that salaries would be cut 5%, effective March 16, 2009, as a cost-cutting measure

to avoid further layoffs after the company announced disappointing fourth quarter earnings.  For

the debtor, this would equate to a reduction of $350.00 per month.  The reduction does not apply

to the debtor's commission income, which would be reduced only if sales to the federal

government were to decline below expected levels.  Although the debtor testified that the

company's overall sales were down, there was no evidence as to the reduction, if any, in sales to

the federal government, which, as the debtor candidly noted, can "print money" in order to fund

purchases.

<u>Discussion</u>

A.

The initial issue raised by the objection is the statutory requirement that, unless claims
are paid in full, a chapter 13 plan must provide that all of the debtor's "projected disposable
income" to be received in the "applicable commitment period" be applied to make payments to
unsecured creditors.  § 1325(b)(1)(B), Bankruptcy Code.  Because the debtor's annualized
income ($93,807) exceeds the statewide median income ($46,055) for a household of the same
size, the applicable commitment period is 60 months.  § 1325(b)(4).  The term "projected
disposable income" is not defined by the statute, but the term "disposable income" is.
Disposable income consists of "current monthly income"—itself defined as the average monthly
income received by the debtor from all sources (with certain specified exceptions not applicable
here) in the six month period *preceding* the filing of the petition—less amounts "reasonably
necessary to be expended . . .  for the maintenance or support of the debtor" and qualified
charitable contributions.  §§ 101(10A) and 1325(b)(2), Bankruptcy Code.  For debtors whose
income is greater than the state-wide median for a household of the same size, the amounts
"reasonably necessary to be expended" are determined using the so-called "means test" that was
established for chapter 7 cases by the Bankruptcy Abuse Prevention and Consumer Protection
Act of 2005, Pub.L. 109-8, 119 Stat. 23 ("BAPCPA").  §§ 1325(b)(3) and 707(b)(2)(A) and (B),
Bankruptcy Code.

In this case, the objecting creditor does not dispute either the mathematical calculation of
current monthly income or the claimed means test deductions.  Rather, Mr. Leskoski contends
that the disposable income so computed does not reflect the debtor's true ability to make

4

payments on a going forward basis because the starting point for the calculation, CMI, is skewed

by the fact that the debtor was unemployed for two of the six months of the look-back period.

Mr. Leskoski asserts that "disposable income" is only the starting point for determining

"projected disposable income," which he argues is a forward-looking concept that must

necessarily take account of the income actually being received by the debtor at the time the plan

is confirmed.

It has not escaped the attention of courts applying the new disposable income test that the

means test calculation sometimes results in a figure that is dramatically at odds with the reality

of the debtor's ability to pay.  Sometimes this occurs because the starting point for the

calculation—current monthly income—does not represent "current" income at all but rather the

average monthly income received in the six months *preceding* the filing of the chapter 13

petition.  A debtor who was unemployed for a substantial portion of that period but now has a

well-paying job, for example, will show little in the way of disposable income under the means

test, while the schedules I and J will show substantial surplus income with which to make plan

payments.  The reverse can also occur: a debtor who has recently lost a high-paying job or who

received unusual payments (such as severance or a year-end bonus) in the six-month period may

show disposable income that is far beyond his or her actual ability to pay.  Distortions can also

occur with respect to the allowed deductions from current monthly income.  For example, the

means test envisions a hypothetical chapter 13 scenario in which secured debts are paid in full

according to their original contract terms, while the debtor's actual plan may propose to

surrender the collateral or (if permitted) to bifurcate an under-secured claim into secured and

unsecured components or reamortize the debt at a reduced interest rate.

5

Courts have reacted to these distortions in a number of ways.  Some have simply applied the means test calculation regardless of result on the ground that Congress must have intended what it clearly said.  *See, e.g.*, *In re Barr*, 341 B.R. 181 (Bankr. M.D. N.C. 2006); *In re Alexander*, 344 B.R. 742 (Bankr. E.D. N.C. 2006).  Others have articulated various circumstances under which they would depart from the calculation when it leads to a result that they believe was not what Congress envisioned.  *In re Edmunds*, 350 B.R. 636 (Bankr. D. S.C. 2006) (holding that projected disposable income for above-median income debtor is not fixed by means test calculation that includes expenses that would not actually be incurred under plan, such as car payments for car to be surrendered); *Beskin v. McPherson (In re McPherson)*, 350 B.R. 38 (Bankr. W.D. Va. 2006) (projected disposable income for above-median income debtor would not include deduction for contractual payments on under-secured debt that debtors would not actually be required to pay because plan bifurcated claim or surrendered collateral); *In re Minahan,* 394 B.R. 116 (Bankr. W.D. Va. 2008) (holding that for above-median income debtors, projected disposable income calculated on Form B22C is the starting point, but not the ending point, in determining debtor's correct minimum obligation, and both income and expenses must be determined as of date of confirmation); *In re Watson*, 366 B.R. 523 (Bankr. D. Md. 2007) (holding that above-median debtor was entitled to deduct IRS vehicle ownership allowance in computing disposable income even though debtor did not owe anything on the vehicle, but stating that party may present evidence to show substantial change of circumstances such that disposable income on Form B22C is not a fair projection).

So many jurists have written so ably on the various canons of statutory construction and the competing policy concerns that there is little of value that this court can add to the debate.

The major difficulty lies in the use of the word "projected" to modify the defined term,

"disposable income."  If projection simply means *extrapolation,* then it is difficult to see how

projected disposable income over a 60-month commitment period can mean anything other than

the calculated disposable income multiplied by 60.  On the other hand, financial projections

(reliable ones, at least) are seldom simple extrapolations of a snapshot.  Rather, meaningful

financial projections (such as those embodied in business plans) necessarily take account of

anticipated or likely changes in revenue and expenses over the projection period.  The problem,

however, with treating the disposable income calculation under the means test as a mere

"starting point" for calculating projected disposable income, as many courts have done, is that

the exercise can quickly degenerate to a return to the pre-BAPCPA practice of subjective judicial

determinations (often varying widely from district to district or even among judges in a single

district) of how much a given debtor ought to pay.  While there is much that is murky in the

language of the statute, it seems clear that one thing Congress intended to accomplish was to

replace subjective judicial determinations with an objective test.  Although a literalistic

application of the means test no doubt leads to results that are sometimes arbitrary, it has the

countervailing virtue of uniformity.

### B.

Having considered the arguments of the parties and the cases cited, the court is inclined

to walk a middle path between those courts that strictly adhere to the means test calculation,

however far it may be removed from reality, and those that use it as a mere "starting point."

When the disposable income calculation leads to a result that is seriously distorted, this court

believes it is proper to take the distortion into account in determining projected disposable

income—which is to say, the court would not treat projection as a simple straight-line extrapolation of disposable income as calculated by the means test.  At the same time—mindful of what appears to be Congress's intent to achieve uniformity and predictability by substituting an objective for a subjective test—the court does not believe that the disposable income figure as calculated by the means test should be adjusted except for the most weighty considerations.  Put another way, Congress must surely have envisioned, when it specified that CMI was to be calculated as the average income received in the six-month period *preceding* the filing of the bankruptcy petition, that such income might vary considerably from month to month.  Congress must surely also have recognized that using the past as a proxy for the future, while simplifying the calculation, would not always lead to accurate results.  Thus, the court is not inclined to disregard the result of the disposable income calculation solely because it exhibits distortions of a magnitude that could fairly be expected in applying a test that by its very construction arbitrarily treats past income as the equivalent of future income.  Here, the fact that the debtor was unemployed for two of the six months in the look-back period obviously leads to some distortion.  Specifically, the calculated CMI of $7,817 understates by some 32% the debtor's actual average gross monthly income of $11,429 since taking his present job.  However, without attempting to lay down a bright-line rule, the court cannot find that the magnitude of the distortion in this case is sufficiently severe to justify disregarding the statutory disposable income calculation in determining projected disposable income.  Accordingly, the court will overrule Mr. Leskoski's objection to the extent it is grounded on the failure to pay projected disposable income.

8

C.

Simply "passing" the disposable income test, however, does not necessarily end the

inquiry.  As this court has previously observed,

> [T]he requirement of § 1325(a)(3) that the plan be proposed in good faith might
> bar confirmation even though the disposable income test is technically satisfied.
> [Another judge in this district] has held in a reported decision that "[i]f the sole
> objection to the debtor's good faith is that the debtor proposes to pay the amount
> Congress requires by the mathematical formula, the debtor has complied with the
> good faith requirement.  He has done everything Congress has asked him to do."
> *In re Winokur*, 364 B.R. 204, 206 (Bankr. E.D. Va. 2007).  In a pre-BAPCPA
> case, however, the Fourth Circuit treated compliance with the disposable income
> test and compliance with the good faith requirement as separate.  *Solomon v.*
> *Cosby (In re Solomon)*, 67 F.3d 1128 (4th Cir. 1995).  In *Solomon*, the Court held
> that "disposable income" for the purpose of § 1325(b) does not include imputed
> income from exempt IRA's where the debtor, although eligible to withdraw
> without penalty, was not actually doing so.  However, the Court remanded for a
> determination of whether the plan had been proposed in good faith.  *See Deans v.*
> *O'Donnell*, 692 F.2d 968 (4th Cir. 1982) (adopting totality of the circumstances
> test for bad faith where chapter 13 plan proposes no or only minimal payment of
> claims).  Accordingly—at least where a plan proposes no or only minimal
> payment of unsecured claims—I assume that confirmation may be denied on good
> faith grounds even though the debtor technically complies with the means test,
> just as a chapter 7 case may be dismissed for abuse based on the totality of the
> circumstances even though the means test is satisfied. § 707(b)(3), Bankruptcy
> Code.

*In re Desgrosseilliers*, 2008 WL 2725808 at *3 n.7 (Bankr. E.D. Va. 2008).  In the present case,

the confirmation objection, as filed, raised only a disposable income issue.  In a memorandum

filed several days in advance of the evidentiary hearing, however, Mr. Leskoski did assert that

the plan should alternatively be denied confirmation as not having been proposed in good faith.

No objection was made by the debtor at the confirmation hearing to consideration of the good

faith argument.  Accordingly, since the issue has been raised, the court will address it.

In *Deans*, the Fourth Circuit—observing that "Congress never intended, of course, that

Chapter 13 serve as a haven for debtors who whish to receive a discharge of unsecured debts

without making an honest effort to repay them"—identified several non-exclusive factors to be

considered in the good-faith analysis when the debtor proposes a plan paying nothing or only a

minimal amount to unsecured creditors.  These include "the percentage of proposed

repayment, . . . the debtor's financial situation, the period of time payment will be made, the

debtor's employment history and prospects, the nature and amount of unsecured claims, the

debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or

exceptional problems facing the particular debtor."  692 F.2d at 972.   Here, the estimated

percentage of repayment, 25%, although more than "minimal," and indeed substantial in dollar

amount, nevertheless represents a severe compromise.[2]  At the same time, it does not present the

unsavory spectacle, as have some of the reported cases, of debtors with several thousand dollars

a month of actual surplus income proposing zero payment plans to unsecured creditors simply

because the means test would let them do it.  The proposed plan period, 60 months, is the

maximum permitted in chapter 13.  No evidence was presented as to the nature of the debtor's

debts, which are rather higher than normally encountered in a chapter 13 case and which largely

account for the relatively low percentage payout.  There is no evidence of any prior bankruptcy

filings, and no evidence of any unusual or special problems facing the debtor, other than the

obvious uncertainty, faced by many debtors in the present economic climate, as to whether he

will continue to be employed and whether the commission component of his compensation will

suffer.  Although the debtor has been employed in this current position for a relatively short

---

[2]  The total amount to be paid into the plan is $108,300.  After payment of the trustee's 10%
commission, attorney's fees of $1,535, and the filed priority tax claims of $19,089, the amount
remaining for distribution to unsecured creditors would be $76,846. Based on the $317,263 in
filed unsecured claims, the resulting dividend to unsecured creditors would be approximately 24
cents on the dollar.

period of time, and even though there has been one round of layoffs during that time, the debtor's prospects appear to be as good as that of most workers in today's uncertain economy.

To be sure, this is not a case in which the debtor is living a luxurious or extravagant lifestyle at the expense of his creditors. At the same time, the debtor's current financial situation would rather clearly allow him to make payments significantly in excess of the $1,805 per month that he has proposed to make. His actual average take-home pay for the six month period from June through November 2008 was $7,405. His average monthly living expenses as shown on his Schedule J are $3,324, which would leave a monthly surplus of $4,081. Even allowing for normal increases in living expenses (the debtor testified that his rent had recently gone up but did not state by how much) and some wiggle-room for unanticipated expenses, and further allowing for a $350 per month reduction in the debtor's base salary, and thus his monthly surplus, it would appear that the debtor could reasonably afford to pay somewhere between $3,400 to $3,600 per month into the plan without any alteration of his current standard of living. The debtor's plan, however, proposes to pay only about one-half of that amount. Having considered all the circumstances, the court is left with the conviction that the plan does not represent an honest effort to repay creditors to the extent that the debtor's financial ability and circumstances will permit. For that reason, although the court will overrule the disposable income objection, the court will deny confirmation on the alternate ground that the plan was not proposed in good faith.

A separate order will be entered denying confirmation, with leave to file a modified plan.


Date: _____          _____
                                       Stephen S. Mitchell
Alexandria, Virginia                   United States Bankruptcy Judge


Copies to:

Joel S. Kelly
1514 Catlin Lane
Alexandria, VA 22311
Debtor

Tommy Andrews, Jr., Esquire
Tommy Andrews, Jr., P.C.
122 N. Alfred Street
Alexandria, VA  22314
Counsel for the debtor

Edward S. Rosenthal, Esquire
201 North Union Street, Ste. 140
Alexandria, VA 22314
Counsel for Stephen Todd Leskoski

Thomas P. Gorman, Esquire
300 N. Washington St., Suite 400
Alexandria, VA  22314
Chapter 13 trustee